# UNITED STATES DISTRICT COURT
for the

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| Noah Isaac Herrera | ) | Case No. **CR 23-70856-MAG** |
| | ) | |
| *Defendant(s)* | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of  February 8, 2022 and April 7, 2022  in the county of  Santa Clara  in the
Northern  District of  California , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) & (b)(1)(C) | distribution of fentanyl |
| 21 U.S.C. §§ 841(a)(1) & (b)(1)(C) | distribution of fentanyl |

This criminal complaint is based on these facts:

See attached Affidavit in Support of Criminal Complaint by FBI Special Agent Brian Schlofman

☑ Continued on the attached sheet.

/s/ Brian Schlofman w/permission by VKD
*Complainant's signature*

Approved as to form .        /s/        .
AUSA Daniel N. Kassabian

FBI Special Agent Brian Schlofman
*Printed name and title*

Sworn to before me by telephone.

Date: June 13, 2023

*Virginia K. DeMarchi*
*Judge's signature*

City and state: San Jose, California

Hon. Virginia K. DeMarchi, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Brian Schlofman, a Special Agent of the Federal Bureau of Investigation (FBI) and a Task Force Agent with the Drug Enforcement Administration (DEA), being duly sworn, hereby declare as follows:

### INTRODUCTION

1. I am an investigator and law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7). I am empowered by law to conduct investigations, to execute search warrants, and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

2. I make this affidavit in support of the issuance of a criminal complaint and a federal arrest warrants for **Noah Isaac HERRERA** ("HERRERA"). Count 1 and Count 2 charge HERRERA with violating 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (distribution of a Schedule II substance, namely, fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl]propenamide)) on February 8, 2022 and April 7, 2022, respectively.

3. The statements contained in this affidavit are based on my own training, experience, and personal involvement in this investigation, information from records and databases as well as information relayed to me by other law enforcement officers involved in the investigation. Because this affidavit is submitted for the limited purpose of securing a complaint and arrest warrants, I have not included each and every fact known to me that supports probable cause. Rather, I have set forth those facts that I believe are sufficient to support the issuance of the requested complaint and arrest warrants.

### AGENT BACKGROUND

4. I am a Special Agent of the Federal Bureau of Investigation ("FBI") currently assigned as a Task Force Agent to the Drug Enforcement Administration ("DEA") San Jose Resident Office ("SJRO"). As a Special Agent with the FBI, my investigations focus on large-scale narcotics offenders. I have been employed by the FBI since January 2019. Prior to being assigned to SJRO, I received nineteen weeks of specialized training at the FBI Academy in Quantico, Virginia. This training included several hundred hours of comprehensive, formalized

instruction in, among other things, basic narcotics investigations, detection, interdiction, United States narcotics laws, financial investigations and money laundering, identification and seizure of drug related assets, undercover operations, and electronic and physical surveillance procedures. I have participated in several investigations relating to drug trafficking, the arrests of at least twenty persons involved in drug trafficking, and on at least ten occasions, I have been involved in searches of locations in connection with drug trafficking investigations. As a result of my training and experience, I am familiar with how various drugs, including crystal methamphetamine, are used and the typical distribution and trafficking methods used by drug dealers and traffickers. I am also familiar with the various methods generally utilized by traffickers to transport drugs in and through the state of California.

5. I have spoken to, and worked with, more experienced federal, state, and municipal narcotics agents and officers. During the course of my employment as a Special Agent, I have participated in several investigations of illicit drug trafficking organizations involving the use of confidential informants, electronic and physical surveillance, the analysis of telephone toll records, investigative interviews, and the service of search and arrest warrants. These investigations include the unlawful importation, possession with intent to distribute, and distribution of controlled substances, and conspiracies associated with criminal narcotics offenses, in violation of 21 U.S.C. §§ 841(a)(1) and 846.

6. I have been involved in the execution of numerous federal search warrants related to drug trafficking investigations. As a result, I have encountered and become familiar with the various tools, methods, trends, paraphernalia, and related articles used by traffickers and trafficking organizations in their efforts to import, conceal, manufacture and distribute controlled substances.

7. I am also familiar with the manner in which narcotics traffickers use vehicles, telephones, cellular telephone technology, coded communications or slang-filled conversations, false or fictitious identities, and other means to facilitate their illegal activities and thwart law enforcement investigations. Furthermore, I have become familiar with the manner in which

narcotics traffickers smuggle, transport, store, and distribute narcotics, as well as how they collect and launder drug proceeds.

8. Based upon my training and experience, and the training and experience of other agents, I know that it is common practice for narcotics traffickers to routinely utilize telephones and cellular telephones in order to communicate with their customers, suppliers, couriers, and other co-conspirators and in order to insulate themselves from detection by law enforcement. Moreover, it is not unusual for them to initiate such service under the name of an associate or a fictitious name. Furthermore, it is not unusual for narcotic traffickers to utilize false or incomplete addresses while filling out subscriber information related to their cellular telephones. Therefore, such data often will not be useful to determine the location of a particular cell phone user.

9. My awareness of these drug trafficking practices, as well as my knowledge of drug use and distribution techniques as set forth in this Affidavit, arise from the following: (a) my own involvement in drug investigations and searches during my career as a law enforcement officer, as previously described; (b) the advice of other agents and police officers relating to the substance of their similar debriefings and the results of their own drug investigations; and (c) other intelligence information provided through law enforcement channels.

## STATEMENT OF PROBABLE CAUSE

10. The Drug Enforcement Administration (DEA) and Federal Bureau of Investigation (FBI) (collectively "the Investigative Agencies") have been investigating the drug trafficking activities of Noah Isaac HERRERA, and others in the Northern District of California and elsewhere.

### I. COUNT 1: 21 U.S.C. §§ 841(A)(1) AND 841(B)(1)(C) – DISTRIBUTION OF FENTANYL ON FEBRUARY 8, 2022

11. On January 21, 2022, at approximately 2:01 p.m., CS-1,[1] acting under the

---

[1] CS-1 is working for sentencing consideration arising from his/her arrest in 2021 on drug-related charges regarding the sale of fentanyl. CS-1 has provided agents with information regarding other drug traffickers that agents have been able to independently corroborate. CS-1 has been previously convicted of misdemeanors for assault with a deadly weapon. Agents believe CS-1 has supplied information that is truthful (that is, the information was supplied without apparent deception and subject to the apparent limits of this informant's knowledge). To date, agents have

direction of DEA/FBI, and using an investigative tool used for consensually monitoring and recording conversations,[2] sent a text message to HERRERA at 415-910-3664 (hereinafter, "Phone x3664"), which read: "Wassup wit poem scripts I gotta maneuver sum $". Based on my training and experience, and based on the direction given to CS-1 by agents, I believe that CS-1 asked HERRERA to give CS-1 details about prescription drugs ("scripts") for sale because CS-1 needed money ("I gotta maneuver some $").

12. At approximately 4:26 p.m., CS-1 received a phone call from Phone x3664. A transcript of that monitored and recorded call is set forth below:

| NAME | TRANSCRIPTION |
|---|---|
|  | [NON-PERTINENT PORTION OMITTED] |
| HERRERA | [unintelligible]…cuz I got hella 'scripts. |
| CS-1 | It's good, brah, just… |
| HERRERA | [talking over CS-1]…hella scores right now |
| CS-1 | It's good but I'm just out here though. |
| HERRERA | Hey, you already know I can make that shit shake for you like nothin'. You know I got you. I live right next to the post office right now. |
| CS-1 | Alright. Fo' sho'. |
| HERRERA | Fuckin' so, uh… |
| CS-1 | Yeah, I just gotta be hella careful, bruh. That's the thing. |
| HERRERA | No, yeah fo' sho'. And I got hella 'scripts, you feel me. [Unintelligible] Just real ones…way better than the fake ones. |
| CS-1 | Okay, okay fo' sho'. |
| HERRERA | You feel me? So…uh… |
| CS-1 | Like the…like the…like the "Z's"? |
| HERRERA | So right now, I gotta, I just popped the seal of these B707s, the real Xan. |
| CS-1 | Okay |
| HERRERA | The real 2 milligram ones, feel me? You could bust the 'scripts. I was also gonna ask you, fuckin', I got the real 30s right now, I got real Adderall, I can get 10's, I can get all types of 30s, all the different kinds, bro. Real 30's, feel me, uh, I could probably get 40's right now. I can get hella shit [unintelligible]. |
|  | [NON-PERTINENT PORTION OMITTED] |

13. Based on my training and experience, I believe that HERRERA told CS-1 that he (HERRERA) had a large quantity of prescription drugs ("hella 'scripts'"). HERRERA clarified that he had genuine prescription drugs for sale which were better than the counterfeit drugs

---

been able to independently corroborate CS-1's information.

[2] Unless otherwise stated, all calls and texts sent or received to/from CS-1 were made using an investigative tool used for consensually monitoring and recording conversations. Additionally, all outgoing calls and texts from CS-1 to HERRERA were made under the direction of FBI/DEA, unless otherwise specified. With respect to all of these recorded conversations, agents verified the calls between CS-1 and HERRERA through phone records, specifically toll data.

4

("Just real ones…way better than the fake ones"). CS-1 asked if HERRERA had any Xanax ("like the Z's"). HERRERA gave examples of the types of prescription drugs he had available, including Xanax ("the B707s, the real Xan"), Percocet ("real 30s"), Adderall, and other unknown pills ("10s" and "40s").

14. On January 25, 2022, at approximately 4:47 p.m., CS-1 received a phone call from Phone x3664. A transcript of that monitored and recorded call is set forth below:

| NAME | TRANSCRIPTION |
|---|---|
|  | [NON-PERTINENT PORTION OMITTED] |
| CS-1 | So how much for the fuckin', uh, for the blues? For the 'scripts that you popped? |
| HERRERA | Oh, the real ones? |
| CS-1 | Yeah |
| HERRERA | Shit, I be taxin' niggas like 50… |
| CS-1 | [Overlapping] How much… |
| HERRERA | I be taxin' niggas like 50 bro…but for you bruh…I pay, look I pay 36, and I get it to you for 36 bruh. Feel me [unintelligible]… |
| CS-1 | Each? For like each? |
| HERRERA | Yeah, the real 30s, bro? They go for like 60 [overlapping]… |
| CS-1 | [Overlapping] Damn…that's past foo…[chuckles] |
| HERRERA | I paid 36, nigga, for a roll. |
| CS-1 | Well what's the, what's good with the other ones? Like… |
| HERRERA | The [unintelligible, overlapping] |
| CS-1 | [Overlapping] You can't get, you can't, yeah, you can't it for like cheaper ones, still? |
| HERRERA | I can get, nigga, I got great…I got the best line ever right now, bruh. |
| CS-1 | Well fuck, I'm tryna, how much are those ones? [overlapping] |
| HERRERA | [Overlapping] I mean, I didn't e… I didn't even wanna bring that shit up with you. |
| CS-1 | I feel it. |
| HERRERA | Fuckin' like um…like a titanic? |
| CS-1 | Yeah |
| HERRERA | [coughs] Shit [overlapping] |
| CS-1 | [Overlapping] Like what's the price on something like that? |
| HERRERA | [Overlapping] Like twenty… twenty-two bro, for one. |
| CS-1 | Twenty-two? |
| HERRERA | Yeah, I'm about to go to LA, too, and meet this cartel nigga [overlapping] |
| CS-1 | [overlapping] …that's a, that's a score. |
| HERRERA | [overlapping] yeah, bruh, see me, I'm telling you right now…[overlapping] |
| CS-1 | [overlapping] That's a score. |
| HERRERA | Shit, look, I just got the line straight from, straight from Mexico, nigga, straight…straight, uh, like tunnel, straight to San Jose, so…feel me? |
| CS-1 | Yeah |
|  | [NON-PERTINENT PORTION OMITTED] |

15. Based on my training and experience, I believe that CS-1 asked HERRERA about the price for the authentic Percocet ("the blues"). HERRERA stated he charged customers $50 per pill ("taxin' niggas like 50") for the authentic Percocet ("real ones"), but he clarified that he

5

gets the authentic Percocet for $36 ("I pay 36") per pill and that he would sell them to CS-1 for that price. CS-1 asked HERRERA about the counterfeit Percocet ("other ones") and HERRERA said he had a great supplier for counterfeit Percocet ("I got the best line ever right now"). I know that narcotics traffickers commonly refer to 1,000 pills as "a boat" and HERRERA said he could sell 1,000 pills by referring to a boat ("a titanic") to CS-1 for $2,200 per pill ("22"). HERRERA said he was about to go to Los Angeles, to meet with someone from a cartel ("cartel nigga") and that he, HERRERA, had a source of supply directly connected to Mexico ("got the line straight from, straight from Mexico").

16. On February 6, 2022, at approximately 8:57 p.m., CS-1 received a phone call from Phone x3664. A transcript of that monitored and recorded call is set forth below:

| NAME | TRANSCRIPTION |
|---|---|
| | [NON-PERTINENT PORTION OMITTED] |
| CS-1 | Hey I was trynna make that happen, bruddah. |
| HERRERA | What? |
| CS-1 | Uh, I need a titanic. Just one. |
| HERRERA | It's all good. |
| CS-1 | Alright. You said uh, twenty-two, right? |
| HERRERA | Yeah. [Unintelligible]…for two bruh. |
| CS-1 | You said what? |
| HERRERA | I got you for two. |
| CS-1 | For two? |
| HERRERA | Yeah. |
| CS-1 | Alright, that's good. |
| HERRERA | Yeah. |
| CS-1 | Alright, uh…I can do the drive out there and, uh, you swoop it. |
| HERRERA | Yeah, I'm not mobile for shit, nigga, so you gotta pull up on me. |
| CS-1 | It's good, uh…[clears throat]. Probably like Tuesday I could flight out. |
| HERRERA | After tomorrow? |
| CS-1 | Yeah, cuz I got my kid tomorrow but Tuesday I'll be free. |
| HERRERA | It's all good. |
| CS-1 | Alright, bruh. |
| | [NON-PERTINENT PORTION OMITTED] |

17. Based on my training and experience, I believe that CS-1 ordered 1,000 counterfeit Percocet pills ("a titanic. Just one.") from HERRERA. HERRERA clarified he could sell that to CS-1 for $2.00 per pill ("I got you for two"). HERRERA told CS-1 that he (HERRERA) was not able to meet CS-1 elsewhere ("I'm not mobile for shit") and that CS-1 had to drive to HERRERA ("you gotta pull up on me"). CS-1 and HERRERA agreed to do the deal

6

on February 8, 2022.

18. On February 8, 2022 at approximately 11:38 a.m. and approximately 1:08 p.m., CS-1 and HERRERA, who was utilizing Phone x3664, were in text and telephonic contact to determine a meeting place. For example, at approximately 12:43 p.m., CS-1 received a text message from Phone x3664, which read "3507 palmilla dr". Shortly thereafter, CS-1 received an MMS message from Phone x3664, which contained a pin of Phone x3664's location, which was near 3669-3699 Zanker Road, San Jose, California 95134. Palmilla Drive and Zanker Road are streets that surround the apartment complex where HERRERA lived.

19. At approximately 12:52 p.m., agents established surveillance in the vicinity of 3507 Palmilla Drive, which is in the vicinity of 3699 Zanker Road.

20. In preparation for this meeting at approximately 12:20 p.m., agents met with CS-1 at a neutral location. Agents searched CS-1's person and vehicle for contraband.[3] CS-1 had no personal money on his person at the time of the search. At approximately 12:55 p.m., agents transferred $2,200 in DEA Official Advanced Funds (OAF) to CS-1. At approximately 12:56 p.m., agents provided CS-1 with audio and video recording equipment and activated the recording devices. At approximately 1:01 p.m., CS-1 departed the neutral location and agents maintained visual surveillance on CS-1.

21. At approximately 1:11 p.m., CS-1 sent a text message to Phone x3664 which read, "Pulling up". At approximately 1:12 p.m., CS-1 received a phone call from Phone x3664. Based on my training and experience, I believe that CS-1 was advising HERRERA that he was in the area of their pre-arranged meeting location, and that in the ensuing phone call, HERRERA told CS-1 that he, HERRERA, was already there. I believe that CS-1 and HERRERA then acknowledged that they saw each other At approximately the same time (1:12 p.m.), agents observed CS-1 drive southbound on Zanker Road. Agents observed a Hispanic male in his early 20s, wearing a white or light gray hoodie and black shorts, standing on the sidewalk of Zanker

---

[3] During the search, agents found a plastic baggy containing a white powdery substance, further contained within a clear plastic bag, which was later tested and found to contain cocaine.

Road. Agents identified the male as HERRERA. CS-1 parked CS-1 vehicle on Zanker Road, near 3699 Zanker Road, on the east side of 3507 Palmilla Drive, in front of HERRERA. At approximately 1:13 p.m., HERRERA got into the front passenger seat of CS-1's vehicle.

22. The audio and video recording of this meeting captured CS-1 asking HERRERA, "You said two? Or twenty-two?" HERRERA then responded, "Two, it's all good." CS-1 then handed HERRERA the money and HERRERA handed CS-1 the narcotics. CS-1 then asked, "Is it a thousand?" to which HERRERA replied, "Yeah."

23. Based on the audio and video recording, and based on my training and experience, I believe that HERRERA confirmed the price of the narcotics was $2,000 ("Two, it's all good") and CS-1 gave HERRERA $2,000 of OAF. HERRERA then handed CS-1 a bag of the counterfeit Percocet (Exhibit 1). CS-1 asked if there were 1,000 pills in the bag ("Is it a thousand?") and HERRERA confirmed that there were ("Yeah").

24. The DEA Western Regional Laboratory later counted and tested the contents of Exhibit 1 and confirmed Exhibit 1 to be 1,003 tablets that tested positive for the presence of fentanyl. Specifically, they had a net weight of 109.325 grams ± 0.003 grams, and a purity of 2.0% ± 0.5%.

## II. COUNT 2: 21 U.S.C. §§ 841(A)(1) AND 841(B)(1)(C) – DISTRIBUTION OF FENTANYL ON APRIL 7, 2022

25. On April 5, 2022, at approximately 3:28 p.m., CS-1, acting under the direction of the FBI and DEA, and using an investigative tool used for consensually monitoring and recording conversations, sent a text message to Phone x3664, utilized by HERRERA. CS-1 received a phone call immediately from Phone x3664, utilized by HERRERA. A transcript of a portion of that monitored and recorded call is set forth below:

| NAME | TRANSCRIPTION |
|---|---|
|  | [NON-PERTINENT PORTION OMITTED] |
| CS-1 | Hey, I'm trying to grab one more on Thursday. Is it good? |
| HERRERA | Yeah, it's good. |
| CS-1 | Alright. Fo' sho'. |
| HERRERA | Alright. |
|  | [NON-PERTINENT PORTION OMITTED] |

8

26. Before this call, CS-1 had been instructed by agents to order 1,000 pills of counterfeit Percocet. Based on my training and experience, and based on the February 2022 controlled narcotics purchase in which the CS-1 purchased approximately 1,000 pills (a boat) of counterfeit Percocet, I believe that in this phone call, CS-1 ordered another thousand pills ("one more") from HERRERA and HERRERA confirmed that he (HERRERA) would be ready on April 7, 2022 ("Thursday") with the pills.

27. On April 7, 2022, at approximately 6:36 a.m., CS-1 received a phone call from Phone x3664. I listened to the call and based on my training and experience, I believe that during the call HERRERA told CS-1 that HERRERA forgot that the narcotics transaction between HERRERA and CS-1 was scheduled for that day (April 7, 2022), but was going to proceed nonetheless that day.

28. At approximately 11:40 a.m., agents met with CS-1 at a neutral location. Agents searched CS-1's person and CS-1's vehicle for contraband with negative results. At approximately 11:42 a.m., agents provided CS-1 with OAF to purchase the counterfeit Percocet pills.

29. At approximately 12:03 p.m., agents established surveillance in the vicinity of 3507 Palmilla Drive, San Jose, California.

30. At approximately 12:44 p.m., CS-1 placed a phone call to Phone x3664 that, based on my training and experience, was at the same location (near 3699 Zanker Road) for their narcotics transaction as the prior transaction on February 8, 2022.

31. At approximately 12:55 p.m., agents provided CS-1 with audio and video recording equipment and activated the recording devices. Shortly thereafter, CS-1 departed the neutral location and agents maintained visual surveillance on CS-1.

32. At approximately 1:04 p.m., agents observed CS-1 arrive on Zanker Road, outside of 3507 Palmilla Drive.

33. At approximately 1:06 p.m., agents observed HERRERA approach CS-1's vehicle and open the front passenger door. The pertinent part of the audio recording of this meeting included CS-1 telling HERRERA that CS-1 was going to sell the pills ("drop these shits off") and

9

HERRERA asked if CS-1 was going to sell all 1,000 pills at once ("trying to get it all off at once").

34. In the car, according to CS-1's debrief after the transaction, and as confirmed by the audio/video recording, HERRERA provided CS-1 with a clear plastic bag with blue pills marked with "M" on one side and "30" on the other side (Exhibit 2). CS-1 provided HERRERA with $2,000.00 in DEA funds.

35. The DEA Western Regional Laboratory later counted and tested the contents of Exhibit 2 and confirmed Exhibit 2 to be 991 tablets that tested positive for the presence of fentanyl. Specifically, they had a net weight of 108.6 grams ± 0.2 grams with a purity of 1.8% ±0.5%.

36. Based on the foregoing, there is probable cause to believe that on or about April 7, 2022, in the Northern District of California, HERRERA did intentionally distribute a Schedule II controlled substance, namely fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).

## CONCLUSION

37. Based on the above information, I hereby assert that probable cause exists to believe that Noah Isaac HERRERA committed the above-described violations of federal law.

/s/ Brian Schlofman w/permission by VKD
BRIAN SCHLOFMAN
Special Agent, FBI
Task Force Agent, DEA

Sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1 and 4(d) on this  13  day of June 2023.

HONORABLE VIRGINIA K. DEMARCHI
United States Magistrate Judge

# DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: [X] COMPLAINT  [ ] INFORMATION  [ ] INDICTMENT  [ ] SUPERSEDING

**OFFENSE CHARGED**

21 U.S.C. §§ 841(a)(1) & (b)(1)(C)
21 U.S.C. §§ 841(a)(1) & (b)(1)(C)

[ ] Petty
[ ] Minor
[ ] Misdemeanor
[X] Felony

PENALTY:
Imprisonment: 20 years (max)
Fine: $1,000,000 (max);
Supervised Release: 3 years (min and max)
Special Assessment: $100;

Name of District Court, and/or Judge/Magistrate Location:
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

**DEFENDANT - U.S**

➤ Noah Isaac HERRERA

DISTRICT COURT NUMBER

**CR 23-70856-MAG**

---

**PROCEEDING**

Name of Complaintant Agency, or Person (& Title, if any)
Drug Enforcement Administration

[ ] person is awaiting trial in another Federal or State Court, give name of court

[ ] this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District

[ ] this is a reprosecution of charges previously dismissed which were dismissed on motion of:
[ ] U.S. ATTORNEY  [ ] DEFENSE

SHOW DOCKET NO.

[ ] this prosecution relates to a pending case involving this same defendant

[ ] prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

MAGISTRATE CASE NO.

Name and Office of Person Furnishing Information on this form: Ismael J. Ramsey
[X] U.S. Attorney  [ ] Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned): Daniel N. Kassabian

**DEFENDANT**

**IS NOT IN CUSTODY**
Has not been arrested, pending outcome this proceeding.
1) [X] If not detained give date any prior summons was served on above charges ➤ _____

2) [ ] Is a Fugitive

3) [ ] Is on Bail or Release from (show District) _____

**IS IN CUSTODY**
4) [ ] On this charge
5) [ ] On another conviction  } [ ] Federal  [ ] State
6) [ ] Awaiting trial on other charges
   If answer to (6) is "Yes", show name of institution _____

Has detainer been filed?  [ ] Yes  [ ] No
If "Yes" give date filed _____

DATE OF ARREST ➤ Month/Day/Year _____
Or... if Arresting Agency & Warrant were not
DATE TRANSFERRED TO U.S. CUSTODY ➤ Month/Day/Year _____

[ ] This report amends AO 257 previously submitted

---

**ADDITIONAL INFORMATION OR COMMENTS**

PROCESS:
[ ] SUMMONS  [ ] NO PROCESS*  [X] WARRANT    Bail Amount: No Bail

If Summons, complete following:
[ ] Arraignment  [ ] Initial Appearance

Defendant Address:

* Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

Date/Time: _____    Before Judge: _____

Comments: